OPINION OF THE COURT
Edwin Margolis, J.
Claimant insurance company, as subrogee, commenced this action for legal fees and expenses incurred in defending its insured, Dr. Marieta G. Angtuaco, in an action for medical malpractice. Claimant avers that the State was obligated under Public Officers Law § 17 to defend Dr. Angtuaco and that it wrongfully refused and failed to do so. Claimant’s motion to file a late claim was granted by this court in a memorandum-opinion and order filed February 1, 1989.
In that memorandum-opinion, the court set forth the basic facts of this case as follows:
"The proposed claim states that Dr.. Angtuaco was employed as a full-time Assistant Professor in the Department of Obstetrics-Gynecology at the School of Medicine of the State University of New York (SUNY) at Buffalo at all times relevant to the proposed claim.
"In 1985, a patient upon whom Dr. Angtuaco performed a post-partum tubal ligation commenced a medical malpractice action against her and Children’s Hospital of Buffalo. The claim alleges that as part of her duties and within the scope of her employment as an Assistant Professor at SUNY Buffalo School of Medicine, Dr. Angtuaco was required to teach and explain surgical procedures to medical students and residents by having such students and residents observe or assist her in the performance of these operations.
"Dr. Angtuaco contended that performing this operation, during which she was assisted by the chief resident and a third-year resident in Obstetrics-Gynecology at SUNY Buffalo *240 School of Medicine,[1] was an aspect of the clinical education of the residents. Therefore, since she was fulfilling her teaching responsibilities, she believed that the operation in question was within the scope of her duties as an employee of the State of New York within the meaning of Public Officers Law § 17. Accordingly, Dr. Angtuaco requested the State of New York to provide her with a defense in the malpractice action pursuant to the provisions of Public Officers Law § 17 (2) (a) which requires that 'the state shall provide for the defense of the employee in any civil action or proceeding in any state or federal court arising out of any alleged act or omission which occurred or is alleged in the complaint to have occurred while the employee was acting within the scope of his public employment or duties.’ In a letter dated February 27, 1986, an Assistant Attorney General denied Dr. Angtuaco’s request for a defense on the ground that the plaintiff in the malpractice action was a patient who paid a fee through Dr. Angtuaco’s practice plan and, thus, section 17 did not authorize the State to provide a defense.”
Dr. Angtuaco had purchased a medical professional liability insurance policy from claimant. This policy was issued at a reduced premium because it excluded coverage for actions arising out of services rendered within the scope of Dr. Angtuaco’s employment by the State University of New York (SUNY), actions for which (it was assumed) she would be entitled to protection under Public Officers Law § 17. The policy further provided that, whenever there was a dispute over whether the State should provide coverage under section 17, claimant would provide a defense without prejudice to any rights it might have. When the State declined to provide a defense and coverage in the instant malpractice action, Frontier considered itself obligated to and did provide a defense under this provision of its policy with Dr. Angtuaco.
Claimant now moves for summary judgment on the ground that the evidence is incontrovertible that Dr. Angtuaco was acting within the scope of her employment at SUNY when she performed the surgical procedure in question and, therefore, the State was obliged, under Public Officers Law § 17, to defend and indemnify her. In addition to opposing claimant’s motion, the State cross-moves for summary judgment on the grounds that claimant either has no right to recover for *241 services that it voluntarily provided or that it cannot be subrogated to Dr. Angtuaco’s rights under Public Officers Law § 17. Since the State’s cross motion for summary judgment raises the issue of Frontier’s standing to present this claim, we will deal with that question first.[2]
The State’s initial argument is based on the fact that the insurance policy between claimant and Dr. Angtuaco provides for claimant to become responsible for defending and indemnifying the doctor only in the event that "the insurance carrier for the State University of New York * * * declines to provide insurance and or indemnity under Public Officers Law Section 17”. (Emphasis supplied.) Defendant argues that since the dispute regarding coverage was with the State of New York, not its insurance carrier, claimant was not contractually required to defend Dr. Angtuaco and, therefore, did so only voluntarily. This argument can only be considered specious.
Neither Dr. Angtuaco nor claimant had any control over or knowledge of whether the State would choose to fulfill its section 17 obligations by obtaining coverage through a carrier, by acting as a self-insurer, or simply by absorbing any losses (self-retention). It is quite evident that the term "carrier”, as it was used in the insurance contract, refers to the entity that would be obligated to represent and indemnify the doctor in an action to which section 17 applied. It is totally irrelevant whether this other party would be an insurance company, the State itself, or some other person or corporation that contracted to provide such services. Thus, claimant was not free to absolve itself through a hyper-technical reading of the contract language. If there is "a reasonable possibility that the insured may be held liable for some act or omission covered by the policy, then the insurer must defend”. (Meyers & Sons Corp. v Zurich Am. Ins. Group, 74 NY2d 298, 302; see also, Ruder & Finn v Seaboard Sur. Co., 52 NY2d 663, 669-670.)
The State’s more substantial argument is that Frontier, as a third party, cannot not be subrogated to the statutory rights of Dr. Angtuaco. Defendant’s position is that section 17 was enacted solely for the benefit of State employees and therefore only an employee may sue to vindicate personal rights thereunder.
In support of this proposition, the State cites to Sun Indem. *242 Co. v Board of Educ. (264 App Div 73) and Zurich Gen. Acc. & Liab. Ins. Co. v State of New York (179 Misc 162). The court believes these cases are distinguishable from the case at bar. In Sun, the contract with a private insurance carrier had been written before the Legislature enacted the relevant indemnity statute. Therefore, there was dual primary liability coverage, and the court found that the private insurance company was obliged by the terms of its policy to assume the risk for which it had actually been paid. Here, in contrast, Frontier expressly excluded coverage for actions arising from Dr. Angtuaco’s State employment and reduced its premiums accordingly. Zurich, which did not involve Public Officers Law § 17 or its progenitors, dealt with a volunteer who sought to be subrogated to another’s personal right. Subrogation includes only instances where one party pays another’s debt "either under compulsion or for the protection of some interest of the party making the payment” (Gerseta Corp. v Equitable Trust Co., 241 NY 418, 425-426) and, thus, cannot be claimed by volunteers. (See also, Agricultural Ins. Co. v A. Rothblum, Inc., 147 Misc 865.) As discussed above, claimant was not a volunteer in the circumstances presented here.
An additional consideration in deciding this issue is the clear language of subdivision (7) of Public Officers Law § 17. "7. The provisions of this section shall not be construed to impair, alter, limit or modify the rights and obligations of any insurer under any policy of insurance.” It is undisputed that the insurance contract provides that Frontier is to be subrogated to any of Dr. Angtuaco’s rights upon assuming defense or making payment under the contract. Even if the contract did not expressly so provide, Frontier would be an equitable subrogee. (New York Bd. of Fire Underwriters v Trans Urban Constr. Co., 91 AD2d 115, 119, affd 60 NY2d 912.) Inasmuch as Public Officers Law § 17 contains no language preventing a subrogee from exercising any right an employee might have in the event of the State’s disclaimer of liability and, pursuant to subdivision (7), the general principles of the law of subrogation apply, we hold that claimant became subrogated to any claim Dr. Angtuaco had against the State under Public Officers Law § 17 as a result of the State’s disclaimer.
Claimant’s motion for summary judgment brings up the substantive merits of the claim. To place this controversy in its proper perspective, consideration must be given to some of the most basic economic and professional facts in medical education. The underlying limiting factor is that, in view of *243 the income levels that a physician may attain in private practice, high caliber professionals cannot be recruited as full-time medical school faculty members under current salary scales. Therefore, it is the practice of most medical schools in this country to allow full-time medical faculty members to also maintain a private practice. In order to regulate the amount of time devoted to such practice (by limiting the total amount of professional income a faculty member may earn), it is generally the procedure to require faculty members to treat their private patients through a practice plan.[3]
The term "practice plan” in this context refers to an arrangement between faculty members and their institutions or departments whereby private patients are accepted and treated within a type of group practice. These individual group plans vary from institution to institution and, within any given institution, from department to department. It may be a true cooperative plan, where profit is shared equally, or simply an administrative arrangement where each doctor receives the net fees paid by his or her patients after an amount is deducted for group overhead. Generally, all such plans require that a percentage of such fees be paid to the institution or the department, and most plans place an overall or sliding scale cap on the doctor’s income or some other type of limitation.
Prior to 1982, article 8-AA of the Education Law authorized the trustees of SUNY to create "clinical practice income management corporations” in accordance with its statutory provisions to collect, manage and disburse clinical practice income at each of the State’s University’s medical and dental schools. These provisions were repealed nine years later (L 1982, ch 924, § 3) because it proved more efficacious and desirable to create plans through collective bargaining agreements with applicable negotiating units. Any plan so established must conform with the provisions of part 340 of the Policies of the Board of Trustees of the State University of New York (8 NYCRR part 340). These provisions require practitioners who hold academic rank in a school of medicine or dentistry and who perform clinical practice for which a fee *244 is customarily charged to become a member of a "plan for the management of clinical practice” (8 NYCRR 340.4 [b]), recognize that the employee may have income that falls outside the categories of either salary or "clinical practice income”[4] (8 NYCRR 340.4 [a] [3]), require each employee to be informed of the maximum compensation he or she may earn through salary, research grants and "clinical practice income” (8 NYCRR 340.4 [f]), and require that a portion of the income of each practice plan be deposited with the medical school (8 NYCRR 340.4 [g]). Thus, practice plans are an accepted and recognized manner in which the income of certain professional State employees may be augmented and the characteristics of such plans for SUNY medical school personnel are governed, at least in part, by the State.
Dr. Angtuaco’s practice plan was for members of SUNY Buffalo Medical School’s Department of Gynecology-Obstetrics and, as required, it provided for a percentage of the profits to be paid to the Department. The affidavits and transcripts of examinations before trial in a related Supreme Court matter which have been offered as documentary evidence in support of the instant motion discuss the nature of the plan. (See, n 3, supra.) These documents clearly indicate that allowing the physicians to treat fee-paying patients was necessary to attract the high quality faculty required to run a first-class medical school.
While practice plans of this type are in effect in medical schools throughout the United States and in all four medical schools in the SUNY system they play an additional important role at SUNY Buffalo, the only State University medical school that does not have its own State-owned hospital. To obtain a hospital setting for its clinical teaching activities, the school has entered into affiliation contracts with local area hospitals including Children’s Hospital and, both the claimant and the officials of the medical school who have previously been deposed maintain that SUNY expects its faculty members to provide, through their practice plan, the patients on whom the students are trained. The other SUNY medical schools also enter into affiliation contracts with outside hospitals to provide for specialized coverage and training, but only at Buffalo does the affiliation perform an absolutely indispens *245 able and essential function, not merely a highly desirable one. Without the affiliation contract at Buffalo, the medical school would be unable to offer any clinical medical educational programs.
Claimant’s motion for summary judgment is based on its argument that the following facts are uncontested: (1) that Dr. Angtuaco was employed as an assistant professor in the Department of Gynecology-Obstetrics at SUNY Buffalo Medical School; (2) that the primary purpose of such employment was to teach gynecology and obstetrics to medical students and resident physicians; (3) that the operation which was the subject matter of the underlying malpractice action, a postpartum tubal ligation, was within the medical specialty of gynecology and obstetrics which Dr. Angtuaco was employed to teach; (4) that the two resident physicians who assisted Dr. Angtuaco in performing this operation were persons for whom she was employed to teach gynecology and obstetrics; (5) that the operation and teaching occurred in a hospital authorized and approved for such purposes by SUNY Buffalo Medical School, and (6) that it was within the contemplation of both SUNY Buffalo Medical School and Dr. Angtuaco that her SUNY teaching duties would include, in addition to classroom instruction and any other assigned duties, treatment of patients who could be private practice plan patients. If these facts are accepted as proven, it is claimant’s position that, since Public Officers Law § 17 required the State to indemnify Dr. Angtuaco for any allegedly negligent act occurring within the scope of her State employment, the State was required to defend and indemnify her in any malpractice action arising from the tubal ligation described above.
When first notified that such an action had been commenced against Dr. Angtuaco, the State declined to provide such coverage on the sole ground that the plaintiff in the malpractice action was a patient who had paid a fee through the doctor’s practice plan. We note that the State has so far declined or been unable to offer a solid legal argument in support of this position. The only facially respectable legal argument that the court can discern is that indemnifying a physician for negligent acts committed in the course of his or her private practice of medicine (which the State views as any work for which the patient pays a fee to the doctor) would constitute a gift of State money to or in aid of a private undertaking in violation of the State Constitution (NY Const, art VII, § 8).
*246 In Matter of Spitz v Abrams (105 AD2d 904, 905), the court stated that "[t]he language of the statutory provision [Public Officers Law § 17] is clear and unambiguous and must be given its ordinary meaning without reference to any other means of interpretation (see Matter of Shannon v Introne, 80 AD2d 834, 835, affd 53 NY2d 929; McKinney’s Cons Laws of NY, Book 1, Statutes, §76).” Section 17’s explicit language directs that a State employee be indemnified for negligent acts committed within the scope of his or her State employment. No limiting language was adopted by the Legislature with respect to excluding otherwise eligible State employees if they also receive fees in addition to their basic salary for such work. If any fair reading of section 17 can be found not to offend the provisions of the Constitution, the statute would be applicable if, in fact, the alleged negligent act was committed within the scope of State employment.
An analogous situation was presented in Michael v Communication Workers of Am. AFL-CIO (130 Misc 2d 424). There, stenographers, who were full-time employees of the New York City Department of Finance, sold and retained all the monetary proceeds from transcripts of formal tax hearings before Department Hearing Officers. The stenographers recorded the entire hearing and transcribed the same during their normal workday and approved overtime, for which they received their usual salary. The stenographers utilized State supplies including typewriters and paper and then sold the transcripts of the hearings to the taxpayer at a per page charge, which they wholly retained. The city agency brought an action for declaratory judgment relief urging that the entire procedure was an unconstitutional gift or loan of public money or property to the employee stenographers in violation of article VIII, § 1 of the NY Constitution. Article VIII, which applies to local finance, corresponds to article VII of the Constitution, which applies to State finance.
The court in Michael (130 Misc 2d, supra, at 432) held that "the sale of transcripts by and resulting income to stenographers was clearly deemed additional salary * * * supporting contractual consideration and negating a NY Constitution, article VIII, § 1 unconstitutional gift or loan of money”. The court also noted that if the sale of transcripts and collection of fees therefor by the agency stenographers constituted an unconstitutional gift of public moneys, or funds, then the longstanding practice of the sale of transcripts by court stenographers would likewise violate the Constitution. This, of course, *247 is not the case. (See, Matter of Burke v O'Brien, 52 AD2d 1040; Alweis v Evans, 123 Misc 2d 627, 629; Judiciary Law § 300; CPLR 8002.)
The court is of the opinion that the right to earn private patient fees may be considered as additional compensation to the faculty member. SUNY Buffalo Medical School (as well as the entire State-wide SUNY medical school system and most private medical schools) have made a judgment that they cannot obtain highly qualified physicians as full-time faculty members unless they offer increased compensation. The solution has been to allow faculty members to treat private patients within limitations imposed by the school. This system serves to increase the faculty members’ compensation and may also, particularly at SUNY Buffalo, serve to provide a supply of patients for teaching purposes. (See generally, Albany Med. Coll. v McShane, 104 AD2d 119, affd 66 NY2d 982; Dolin v Long Is. Jewish Med. Center, 139 AD2d 487; Kountz v State Univ., 87 AD2d 605, affg 109 Misc 2d 319, appeal dismissed 58 NY2d 747.) The current regulatory provisions recognized this, as they distinguish "basic annual salary” (that is, the amount paid to the employee by a direct appropriation of State moneys) from "clinical practice income” but include both of these, along with salary from affiliated hospitals and research grants, in calculation of the employees "maximum allowable compensation”. (8 NYCRR 340.4 [a] [3], [4]; [f].)
Accordingly, the SUNY Buffalo Medical School faculty reimbursement plan is in furtherance of public policy and promotes the public welfare. The faculty member’s right to earn patient fees is an accepted form of additional compensation. The protection afforded by Public Officers Law § 17 for work conducted within the scope of a faculty member’s State employment can also be seen as, if not additional direct compensation, at least as another inducement to attract qualified personnel as faculty members in the State medical schools.[5] Under these circumstances, the court finds that the arrangement whereby the State, through Public Officers Law § 17, defends and indemnifies faculty members in actions arising out of their treatment of practice plan patients, where such *248 treatment is also within the scope of their State employment, does not violate any provision of the Constitution.
Thus the court rejects the State’s inflexible position that the mere fact that a medical service was rendered to a practice plan patient removes a faculty-member physician from the protection of Public Officers Law § 17. A physician may treat, or supervise treatment of, a practice plan patient and at the same time be fulfilling his or her duties as a teacher and acting fully within the scope of his or her State employment. The State’s initial reason for refusing to defend Dr. Angtuaco, therefore, is improper and insufficient. This does not establish, however, that the State was in fact obligated to provide a defense, and if necessary indemnify, in the particular malpractice action commenced against Dr. Angtuaco. If the patient who subsequently brought suit had never been the subject of medical school instruction — if she were, in fact, treated only by Dr. Angtuaco and regular hospital staff as part of the doctor’s totally separate private practice (with which the State is involved only by allowing it to exist and limiting its extent), there is no existing legal rationale for requiring the State to provide the statutory protection that is due only to those who are acting within the scope of State employment.
The critical inquiry, therefore, is not, as the State’s initial response would have it, whether the alleged malpractice occurred when Dr. Angtuaco was treating a practice plan patient or a nonpractice plan patient who was billed, we must assume, directly by the hospital or medical school.[6] The relevant inquiry in this situation is, in truth, no different from the inquiry made in any dispute relating to coverage under section 17: was the act for which the State employee is being sued by a third party one which was performed within the scope of his or her State employment?
Claimant takes the position that there can be no dispute on this point, and the State naturally disagrees. Despite the extensive record before us, the court cannot be entirely satisfied that all the necessary indicia were present and have been *249 proven to be present. Many of the relevant facts, set forth above, are undisputed: Dr. Angtuaco’s employment by the State, the purpose of her employment, the fact that the operation in question falls within the specialty which she is employed to teach, and the intention, on the part of both Dr. Angtuaco and the medical school, that her teaching duties could include treatment of fee-paying patients. However, the affiliation contract between SUNY at Buffalo and Children’s Hospital, where the operation was performed, may contain provisions relevant to whether Dr. Angtuaco’s work there was a part of her work for the State, and we are not entirely satisfied that the assisting residents were, in fact, persons for whom Dr. Angtuaco was employed to teach gynecology and obstetrics.[7] Moreover, many of the statements contained in the affidavits and transcripts are of a general nature — "this is the way it was done” — and do not necessarily relate to the specific individuals and circumstances with which we are concerned. To adequately establish these critical facts in the context of the case before us, further proceedings are necessary.
Claimant’s motion for summary judgment and defendant’s cross motion for summary judgment are denied. A conference will be had in the near future setting a discovery schedule and trial date.

1. As will be discussed later in this memorandum-opinion, there is a question of fact with regard to the status of these residents.

. We note that the State did not raise the issue of standing in its opposition to claimant’s motion to file a late claim.

. Ample testimony establishing the premises of this paragraph is contained in the deposition transcripts of the Dean of the SUNY at Buffalo Medical School, the Assistant Vice-President of Clinical Affairs for the medical school, and the Chairman of the medical school’s Department of Obstetrics-Gynecology which have been submitted in support of claimant’s motion.

. Examples include income derived from a nonaffiliated hospital, during an employee’s vacation period (for calendar year employees), or following the completion of professional obligation (for academic year employees). (8 NYCRR 340.4 [a] [3] [i].)

. Medical malpractice insurance in today’s medical economic climate is a major cost of doing business. If the State provides much of the coverage required by a faculty member, for clinical work performed in furtherance of the member’s teaching duties, the physician’s retained net income will be greater.

. In view of the fact that SUNY at Buffalo does not operate its own teaching hospital, we wonder if there are any such patients or whether all clinical education occurs in connection with the faculty members’ practice plan patients. If the latter situation prevails, the State’s interpretation of Public Officers Law § 17 would deny protection for any act of medical negligence on the part of the faculty member, no matter how intimately involved it may have been in the students’ education.

. Residents are traditionally employed by a hospital, not a medical school, and there is no definitive evidence before us to establish the relationship between the two assisting residents and SUNY at Buffalo.