OPINION OF THE COURT
Albert A. Blinder, J.
These claims are, in all respects relevant here, identical to the claim in Frontier Ins. Co. (Angtuaco) v State of New York (172 AD2d 13, affg 146 Misc 2d 237). In each case, a physician employed as a full-time professor of medicine at a State University of New York (SUNY) medical school was sued in medical malpractice by a former patient. In each instance, the physician asked to be defended by the Attorney-General pursuant to Public Officers Law § 17 and the Attorney-General refused because the patient had been billed through the physicians’ clinical practice plan.
Claimant, Frontier Insurance Co. (Frontier), issued to each of these doctors a malpractice insurance policy that, by its terms, excluded coverage for actions performed "within the scope of their State employment.” The policies required, however, that if the State declined to defend and indemnify the doctor, Frontier would provide coverage. After the Attorney- *439 General so refused, claimant stepped in to provide a defense and, where relevant, indemnification up to the policy limit. Frontier then commenced these actions to recover the amounts expended in legal fees and for any amounts paid out for judgment or settlement in the malpractice actions. Frontier brings these claims as subrogee.
The initial Angtuaco decision (supra) rejected the State’s argument that the benefits of Public Officers Law § 17 are unavailable in connection with any such lawsuit for which a patient was billed through the practice plan and held that the relevant inquiry was whether "the act for which the State employee is being sued by a third party one which was performed within the scope of his or her State employment” (146 Misc 2d, at 248); it listed six factors to be considered in determining whether the medical services on which the malpractice action is based were performed within the scope of the physician’s State employment (supra, at 245). In affirming Angtuaco, the Third Department also rejected the argument that services provided to practice plan patients were, for that reason alone, outside the scope of the physician’s State employment.
Less than eight months after the Appellate Division decision, the Legislature enacted an amendment to Public Officers Law § 17 which added a new subdivision (11): "The provisions of this section shall not apply to physicians who are subject to the provisions of the plan for the management of clinical practice income as set forth in [8 NYCRR] regarding any civil action or proceeding alleging some professional malpractice in any state or federal court arising out of the physician’s involvement in clinical practice as defined in that plan.” The effect of this amendment, of course, is self-explanatory.
WHETHER PUBLIC OFFICERS LAW § 17 (11) APPLIES RETROACTIVELY AND THEREFORE BARS THESE CLAIMS
According to counsel for defendant, the amendment to Public Officers Law § 17 that added subdivision (11) is, "completely dispositive” of the claims now before the court (as well as more than 50 other claims that have been filed by Frontier as subrogee of SUNY faculty physicians). It is undisputed that Public Officers Law § 17 (11) applies to claims like these and places outside the protections of Public Officers Law § 17 all SUNY faculty physicians who participate in clinical practice plans and who are sued for malpractice by a practice plan *440 patient. The critical question, however, is whether this new provision affects situations in which the State’s duty to defend and indemnify arose prior to passage of the amendment.
A. The Effective Date of Public Officers Law §17 (11)
The bill that added subdivision (11) to Public Officers Law § 17 (NY Assembly Bill A 12339, enacted as L 1992, ch 499) became law on July 17, 1992. It carried the following title: "an act in relation to providing for the adjustment of salaries of certain incumbents in the professional service in the state university; to implement agreements between the state and an employee organization; and to amend the public officers law, in relation to indemnification of certain physicians and making an appropriation therefor.” The central purpose of the bill was to change the salary structure for some SUNY employees and to enact other portions of a collective bargaining agreement between the State and United University Professions (UUP). The provisions take up approximately IV2 pages in McKinney’s 1992 Session Laws of New York. Within those pages, only eight lines are devoted to section 16, the provision that amends Public Officers Law § 17, which is the only part of the bill referring to SUNY faculty physicians and the only part enacting a statute or amending one. Except for the provision amending Public Officers Law § 17, the bill is a typical "paybill”, ratifying a collective bargaining agreement previously reached by the State and the employee organization and authorizing payment of monies to effectuate it.
The final section, 18, states that the act "shall take effect immediately and shall be deemed to have been in full force and effect on and after July 1, 1991.” Other materials submitted to the court show that the preceding collective bargaining agreement had expired on June 30, 1991. It is therefore reasonable that the "paybill” enacting the new agreement should have the same effective date.
It is difficult to see how or why the July 1, 1991 date could or should apply to the amendment of Public Officers Law § 17. In fact, neither party contends that the July 1991 date is in any way related to Public Officers Law § 17 (11). Counsel for defendant urges that the amendment should be applied to all actions and proceedings that were pending on July 17, 1992; this, of course, would result in retroactive application to events occurring considerably earlier. Counsel for claimant argues that section 17 (11) can apply only prospectively.
*441 B. Retroactive Application of Remedial Statutes
As a general rule, a statute is given only prospective application unless its language "either expressly or by necessary implication” requires it to be given retroactive effect (McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [b], [c]). A retroactive statute is defined as one which "looks backward affecting acts occurring or rights accruing before it came into force” (McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [a]). Retroactive application is improper "where it would deprive one of a substantial right, or affect antecedent rights” (McKinney’s Cons Laws of NY, Book 1, Statutes § 53).
Remedial statutes are a recognized exception to the general rule, but they too will be applied retroactively "only to the extent that they do not impair vested rights” (McKinney’s Cons Laws of NY, Book 1, Statutes § 54 [a]). Because remedial statutes or amendments "are to be liberally construed to spread their beneficial results as widely as possible”, it is not necessary that the Legislature expressly authorize retroactive application (McKinney’s Cons Laws of NY, Book 1, Statutes § 54, at 108-109).
Defendant’s central argument is that the Legislature amended Public Officers Law § 17 in order to overcome and reverse the ruling of Angtuaco (supra) — repeatedly described by counsel as "surprising”, "unexpected” and/or "controversial” — that, defendant asserts, improperly overturned a "longstanding agreement” between the State and UUP officials that faculty physicians were not to receive the benefits of Public Officers Law § 17 in lawsuits arising from their treatment of practice plan patients. The 1992 amendment reestablishing this long-standing agreement was therefore remedial, and as such, should be applied retroactively. A logical first step in assessing this argument is to consider the effect that has been accorded other legislation that was enacted in response to "unexpected” court decisions or other outside events.
In some instances, such statutes have been given retroactive effect (see, Fruhling v Amalgamated Hous. Corp., 9 NY2d 541, 546-547; Matter of Consolidated Edison Co. v State Bd. of Equalization & Assessment, 103 AD2d 453, affd on opn below 67 NY2d 783; Cook v City of Binghamton, 67 AD2d 469, affd on other grounds 48 NY2d 323; Matter of Mixter, 83 Misc 2d 290, 295; Adelman v Adelman, 58 Misc 2d 803). In other situations, however, retroactive application is not permitted, even though the legislation was clearly intended to overcome "unexpected” judicial interpretation or to stop harmful activ *442 ity. This occurs when courts determine that applying the statutes and amendments retroactively would infringe on existing, recognized rights (see, Charbonneau v State of New York, 148 Misc 2d 891, affd 178 AD2d 815, affd 81 NY2d 721; Matter of McDonnell, 47 Misc 2d 967).
It is not enough, therefore, for a statute to be enacted to reverse an "unanticipated” court decision or to address an existing wrong to make its application retroactive. Even a statute passed in response to a court decision or to "correct” a perceived ill is to be applied retroactively only (1) if the Legislature intended retroactive application, or at least intended the statute to be remedial and (2) if such application does not infringe on vested rights. Thus, when there is no express statement of the Legislature’s intention with respect to retroactivity, other sources of information must be considered, and even if retroactive application is expressly indicated in the statute or from the legislation’s history, the courts must still decide whether retroactive application would infringe on vested rights or have other impermissible effects on the rights of the parties.
C. Legislative History: Traditional Sources
Where the Legislature’s intentions are not apparent from the plain words of a statute or from express statements in the enabling legislation, recourse must be had to extrinsic matters in order to determine the intent (Sega v State of New York, 60 NY2d 183, 191). A newly enacted piece of legislation may be applied retroactively when the legislative history of a bill establishes that such application was expected and intended by the Legislature. In Becker v Huss Co. (43 NY2d 527), retroactive application was approved by the Court of Appeals despite a direct negative economic impact on insurance carriers because the amendment to Workers’ Compensation Law was so clearly intended to be remedial.
The "clear” remedial intent in Becker (supra) was drawn from an impressive array of accepted sources of legislative history. These included judicial decisions criticizing the prior law, a study by the Law Revision Commission and introductory comments in the Assembly and Senate bills (supra, at 538-539). Memoranda found in the Governor’s Bill Jacket are also an accepted source of information regarding the Legislature’s purpose in enacting a statute, as are memoranda of Joint Legislative Committees and other legislative bodies and news releases about the legislation (see, e.g., Sega v State of *443 New York, supra, at 190-191; Matter of Lorie C., 49 NY2d 161, 169). The over-all course of legislative action has also been consulted. Examples of this include a statute’s reenactment after controversy about it became known and a continuation of the Legislature’s practice of ratifying a multiyear collective bargaining agreement only once and then appropriating needed moneys in successive years (Association of Surrogates & Supreme Ct. Reporters v State of New York, 78 NY2d 143, 155). None of these traditional sources of legislative history are available for section 16 of NY Assembly Bill A 12339.
D. Legislative History: Nontraditional Sources
Counsel for defendant agrees that there are no traditional sources of legislative history for the amendment adding section 17 (11). Because of this, he urges the court to consider affidavits and other statements from some of the individuals involved in pushing for and drafting the amendment; these include SUNY officials and representatives of the Department of Law. None of these individuals were legislators who introduced or voted on the amendment, and very few of their statements predate the Angtuaco decision (supra).
With one possible exception, which is relied upon extensively by defendant, we have located no authority for judicial consideration of this type of material in assessing the purpose and function of a statute. There is, on the other hand, ample authority requiring courts to rely only on contemporaneous statements or writings that were developed by or at least available to the Legislature at the time a statute was enacted (see, McKechnie v Ortiz, 72 NY2d 969, 971, affg 132 AD2d 472; Matter of Garufi v Bennett, 150 Misc 2d 799, 802, and cases cited therein). The intent behind passage of a piece of legislation must be drawn from what the legislators "were aware of’ at the time they were studying the bill and casting their vote for or against its enactment (Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 67). Defendant does not dispute that these authorities apply in "usual” cases but argues that because the amendment to Public Officers Law § 17 was part of a collective bargaining agreement "paybill” it may be treated differently. Kountz v State Univ. (61 AD2d 835)[1] is cited as the sole, and controlling, authority for taking this approach.
*444 The decisions in Kountz (supra) can lead to the conclusion that the method to be used in construing a statute which implements a collective bargaining agreement is very similar to the method used to construe a contract: permitting extrinsic, "parol” evidence, at least where there is a contradiction between certain provisions of the statute. In a very similar situation, the Fourth Department noted that testimony of those "who had a voice in the decision” to adopt a collective bargaining agreement "would be competent and highly relevant if this were an action based solely on contract” (Civil Serv. Empls. Assn. v County of Oneida, 78 AD2d 1004, lv denied 53 NY2d 603). However, since the contract became binding after it was enacted by the County Legislature, it could only be construed by reference to the Legislature’s intent. "The requirement of legislative approval converts this contract question into an issue of statutory construction” (78 AD2d 1004). Defense counsel argues that this case only prohibits testimony by legislators who voted on a bill, while Kountz allows in testimony not of legislators but officials of the employee unions and members of the executive branch. This argument is not persuasive.
Research discloses no instance in which the approach to statutory construction taken in Kountz (supra) has been followed or even discussed. In contrast, the decision in Civil Serv. Empls. Assn, v County of Oneida (supra) is an accepted source of authority on statutory construction in general and is frequently relied upon for the proposition that only preenactment statements of legislators or others may be used in determining the meaning of a statute (see, e.g., People v Korkala, 99 AD2d 161; State of New York v Consolidated Edison Co., 133 Misc 2d 57).
Defense counsel also argues that Public Officers Law § 17 (11) should be given retroactive effect because deference must be shown to the Attorney-General’s consistent determination that Public Officers Law § 17 benefits do not apply to SUNY faculty physicians when they are engaged in treating practice plan patients. We disagree. When the issue is one of statutory analysis, "dependent only on an accurate apprehension of legislative intent * * * there is little reason to accord weight to the [agency’s] interpretation of the amendment” (Matter of Thomas v Bethlehem Steel Corp., 63 NY2d 150, 154; accord, Matter of Town of Mamaroneck PBA v New York State Pub. Empl. Relations Bd., 66 NY2d 722). The Attorney-General’s interpretation, however consistent it may have been, could *445 only be an opinion or "best guess” about the scope of a statute that had never been judicially construed.
E. Legislative Intent as Revealed by Legislative Context
When there is no expression of the Legislature’s intention within the legislation itself and there are no traditional sources of legislative history from which intent might be inferred, there is still a rather helpful area of inquiry, one referred to in the opinion of Judge (now Chief Judge) Kaye in Matter of Sutka v Conners (73 NY2d 395, 403): "Generally, inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history.” With respect particularly to retroactivity, there is authority for considering the treatment accorded similar statutes (Matter of Beary v City of Rye, 44 NY2d 398, 414) and comparison of the language of a specific piece of legislation with that used in related statutes (Matter of Allstate Ins. Co. v Libow, 106 AD2d 110, 116-117, affd on opn below 65 NY2d 807). The language used in and the treatment accorded the original enactment of the statute in question can also be particularly helpful (Sapper v St. Vincent’s Hosp. & Med. Ctr., 190 AD2d 549 [1st Dept 1993]).
A major revision of Public Officers Law § 17 occurred in 1978. That revision and several subsequent pieces of legislation relating to indemnification of public officers reveal the approaches that have been taken by the Legislature with respect to retroactive or prospective applications of this type of statute.
Public Officers Law former § 17 was repealed and the current version was enacted by Laws of 1978 (ch 466). Several parts of the new bill recognized or reaffirmed that the provisions of Public Officers Law § 17 were intended to apply to certain groups that might not immediately appear to be "employees” of the State. The 1978 legislation also appears to contain the only withdrawals or denials of defense and indemnification rights to occur prior to the addition of section 17 (11) (see, L 1978, ch 466, §§ 6, 15). Because rights were being taken away as well as added, the effective date of the statute assumes importance. The Legislature provided: "§ 24. This act shall take effect on the sixtieth day after it shall have become a law but shall not be construed to impair any rights or interest of any state employee accrued, incurred or conferred prior to the effective date of this act, including the rights of *446 any employee under an employment contract or collective bargaining agreement.”
Thus, the Legislature intended the revised Public Officers Law § 17 to apply only prospectively where "accrued” rights were involved. Since 1978, almost all of the legislative changes respecting Public Officers Law § 17 have included new groups within the statute’s protection rather than excluding employees from its coverage. These amending statutes typically become effective "immediately”.
When the Legislature has intended a Public Officers Law § 17 amendment to be applied retroactively, it has stated its intention quite clearly. In 1986, Public Officers Law § 17 (3) was amended to broaden the scope of its coverage (L 1986, ch 844). That legislation provided: "§ 3. This act shall take effect immediately, shall be deemed to have been in full force and effect on and after [April 1, 1985], and shall apply to all actions, proceedings, judgments or settlements pending on [April 1, 1985], or commenced thereafter.”
Other than the amendment adding Public Officers Law § 17 (11), the most recent legislative action relating to Public Officers Law § 17 expressly confers that statute’s protection on a specific group of employees. This legislation is relevant to the cases before us.
On June 30, 1992, less than three weeks before section 17 (11) was added, the Legislature authorized the Commissioner of Health to establish a "plan for the collection and disbursement of clinical practice income resulting from the clinical practice of licensed health professionals employed by Roswell Park Cancer Institute” (L 1992, ch 293, enacted as Public Health Law § 206 [14]). This legislation also ensured that the benefits of Public Officers Law § 17 would be available in connection with treatment of clinical practice patients.[2] The legislation amended subdivision (1) (a) of Public Officers Law § 17 to read, in relevant part, as follows: "(a) As used in this section, unless the context otherwise requires the term 'employee’ shall mean any person holding a position by election, appointment or employment in the service of the state, including clinical practice pursuant to [Public Health Law § 206 (14)]” (italics indicate addition).
*447 This part of the bill was to take effect "immediately”, and since the same bill also authorized creation of that clinical practice plan, the question of retroactivity does not arise. It is hardly necessary to comment on the marked contrast between the two 1992 amendments to Public Officers Law § 17 and to the fact that, despite the similarities that could be drawn between Roswell Park health care providers participating in a clinical practice plan and SUNY faculty physicians participating in clinical practice plans, their rights under Public Officers Law § 17 are now dramatically different.
From the foregoing, we can draw several conclusions. In the only instance in which such rights have been withdrawn or diminished, there is an express indication of legislative concern to protect the rights or interests of employees that have "accrued, incurred or conferred prior to the effective date” of the statute. The Legislature has also demonstrated its ability to explicitly require retroactive treatment when it wishes to do so. Finally, the amendments relating to the clinical practice plan for Roswell Park remove any concern that the Legislature’s action in passing section 17 (11) so quickly after the Angtuaco decision (supra) was a statement, or at least an indication, that providing coverage for work involving clinical practice patients was patently improper or something that was never intended to occur.
WHETHER RETROACTIVE APPLICATION OF SECTION 17 (11) WOULD INFRINGE ON "VESTED” RIGHTS
The above discussions lead to the inescapable conclusion that the often-thorny issue of vested rights has to be addressed before past actions can be held subject to a new rule. The concept of vested rights has been called a " 'fiction’ ”, which " 'hides many unmentioned considerations of fairness to the parties, reliance on preexisting law, the extent of retroactivity and the nature of the public interest to be served by the law’ ” (Matter of Chrysler Props. v Morris, 23 NY2d 515, 523). It is now recognized that the question of whether rights have "vested” rests on policy considerations and is to be determined on a "case-by-case” analysis (Matter of Hodes v Axelrod, 70 NY2d 364, 371).
In Matter of Chrysler Props. (23 NY2d 515, supra), a mortgage recording tax had been paid under protest, and a refund was directed by the Tax Commissioner on the same date as the "effective date” of a later amendment to the Tax Law *448 permitting judicial review of the Commissioner’s decisions. The City consequently sought such review of the Commissioner’s ruling but was denied that opportunity. "[A]ppellant had obtained a sufficiently certain right to the money and * * * the later amendment, which was made retroactive without any discernible reason, cannot alter its right to payment.” (Matter of Chrysler Props. v Morris, supra, at 519; see also, Wittenberg v City of New York, 134 Misc 2d 363, 366.) Other "sufficiently certain” rights have been recognized and protected by the courts (see, Matter of Lusardi v Eugene Lusardi, M.D., P. C, 167 AD2d 3; Dorfman v Leidner, 150 AD2d 935, 936; Charbonneau v State of New York, supra; Ineson v Reznik, 129 Misc 2d 1035, 1036; Saporita v Delco Corp., 104 Misc 2d 527, 530-531).
In a ruling that does not discuss vested rights, as such, but nevertheless illustrates considerations that must be kept in mind when determining a statute’s retroactive application, the Court in Klepper v Klepper (120 AD2d 154, 157) upheld a party’s right to obtain a divorce through the subsequently banned procedure of reverse summary judgment, even though the clearly remedial amendment took effect while an appeal was pending and appellate courts should, in general, apply the law as it exists at the time of appeal. The Fourth Department held that retroactive application "would not be feasible” and "would work [an] injustice” (supra, at 157-158). As indicated in the quotation from Matter of Chrysler Props. (supra, at 518), the concept of vested rights rests on similar consideration of "fairness to the parties” or, in other words, "justice” in a specific situation.
Of the several definitions of the term "vested right” set out in Adelman v Adelman (58 Misc 2d, supra, at 806-807), a somewhat negative description appears to be particularly helpful: "a right is not vested unless it is something more than a mere expectation based upon an anticipated continuation of the present general laws.” This view of vested rights was also expressed by the Court of Appeals in Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal (76 NY2d 325). There, a new regulation prohibiting rent increases in certain circumstances was permitted retroactive application. The Court of Appeals has also stated, in a slightly different context, that "[i]t is not the role of the court * * * without benefit of legislative authority, to cut off abruptly a cause of action good until then under *449 conventional law” (Bay Ridge Air Rights v State of New York, 44 NY2d 49, 55).
The "right” under consideration here is not one that existed because no law prohibited it. Rather, State employees entitled to the benefits of Public Officers Law § 17 received an affirmative grant of protection and, if that protection is wrongfully withheld, they have a valid cause of action against the State. Angtuaco (supra) establishes that, where the requisite circumstances were present, SUNY faculty physicians were entitled to that protection in connection with treatment of private practice plan patients. All of the factors that must be present to determine if treatment of a practice plan falls within the scope of a physician’s State employment occur at or prior to the time that treatment is given. State employees covered by the provisions of Public Officers Law § 17 have something more than "a mere expectation” that the State will defend and indemnify them from the moment that they perform the act which, sometime later, becomes the basis of a civil lawsuit. Subdivision (1) (a) of Public Officers Law § 17 includes in the definition of "employee” a "former employee, his estate or judicially appointed personal representative”. Statutes are not to be construed to reach "absurd” consequences (Matter of Allstate Ins. Co. v Libow, 106 AD2d 110, supra), and for this provision to have meaning, it must apply to the situation where an employee performs an act while in State service and then severs all connection with the State before he is sued for injury arising from that act. The State may, of course, take away that statutory benefit as it applies to future conduct, but it may not remove the rights an employee possessed from the moment he committed the allegedly negligent act.
Decisions about whether "vesting” has occurred are to be based, in part, on policy considerations and the public purpose of the right in question (Matter of Hodes v Axelrod, 70 NY2d 364, 371, supra). The central purpose of Public Officers Law § 17 is defeated if State employees cannot know whether they will be protected by the State until after they have been sued. The employee needs something beyond an "expectation” that the law will not be changed in the future; he needs assurance that the protection is available as he carries out the duties of his employment.
In Angtuaco (supra), and in the Scalea and Mann claims all litigation was completed before the question of Public Officers Law § 17 coverage was judicially considered. If section 17 (11) is applied retroactively: the parties merely stay in their cur *450 rent positions, with Frontier having borne the costs of both defense and indemnification. However, what of the physician whose defense is complete but the amount of judgment against him has not yet been determined? Putting together the effects of Angtuaco and Public Officers Law § 17 (11), that physician would be able to recover his defense costs but not the amount of a judgment, while another physician whose malpractice trial was on a somewhat faster schedule could be indemnified for both. A third physician, whose trial was on a somewhat slower schedule, would have to absorb (or have his alternative insurer absorb) both the judgment amount and part, but not all, of his defense costs. In those situations retroactive application of section 17 (11) would take away something of concrete value; such application would not be "feasible” and would "work an injustice.”
To adapt the language of the Court of Appeals in Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal (supra, at 330), the enactment of Public Officers Law § 17 (11) "supplant[ed] an existing enactment that would have allowed them” the right to a defense and indemnification. Defense counsel’s reliance on DeVivo v Grosjean (48 AD2d 158) for the proposition that Public Officers Law § 17 rights are only a "limited statutory privilege” is simply inaccurate; the decision expressly states that Public Officers Law § 17 created "a cause of action on behalf of an employee or officer against the State” (supra, at 160). Thus, even if we were to agree with defendant that the amendment adding Public Officers Law § 17 (11) was remedial in nature and even if the Legislature specifically stated its intention that the amendment be applied retroactively, such application would be prohibited unless the faculty physicians were in some fashion compensated for the right to protection that was owed to them from the moment they committed the acts of alleged malpractice.
WHETHER SUNY FACULTY PHYSICIANS WAIVED THEIR RIGHT TO THE BENEFITS OF PUBLIC OFFICERS LAW § 17
Defendant has continued to assert that SUNY faculty physicians "waived” any rights they may have had under the statute: a waiver that purportedly occurred when the physicians were first granted the privilege of treating private patients and that is "proven” by reference to events that occurred prior to the decision in Angtuaco (supra). The issue of *451 waiver, in reality, is merely a restatement of defendant’s argument that there was a "long-standing agreement” that Public Officers Law § 17 was not to apply to treatment of practice plan patients, that Public Officers Law § 17 (11) was passed to remedy the situation following Angtuaco, and that, because of this, section 17 (11) should be applied retroactively.
For the reasons discussed at length above, we have held that even if the existence of such an agreement were to be accepted, retroactive application of the amendment would not occur in the absence of a clear indication that the Legislature intended such application and where vested rights would not be infringed.
Neither the physicians, nor their union, expressly waived any Public Officers Law § 17 benefits. Therefore, the defendant relies on certain facts, and inferences allegedly flowing from those facts, to argue the existence of an implied waiver of rights given in exchange for the privilege of treating clinical practice patients.
"A waiver, the intentional relinquishment of a known right * * * may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage [citation omitted]”, and with the exception of "instances where there would be transgressions of public policy”, any of the "rights and privileges to which one is legally entitled” may be waived (Hadden v Consolidated Edison Co., 45 NY2d 466, 469). The party asserting waiver has the burden of establishing that a waiver occurred (City of New York v State of New York, 40 NY2d 659, 669). An implied waiver exists when "one party has pursued such a course of conduct with reference to the other party as to evidence an intention to waive his rights or the advantage to which he may be entitled, or where the conduct pursued is inconsistent with any other honest intention than an intention of such waiver, provided that the other party concerned has been induced by such conduct to act upon the belief that there has been a waiver, and has incurred trouble or expense thereby.” (Black’s Law Dictionary 1417 [5th ed].)
The defendant argues the following in asserting that SUNY faculty physicians waived their rights to Public Officers Law § 17 benefits: When practice plans were created to permit SUNY faculty physicians to treat and receive income from "private” patients, it was understood that such treatment was not entitled to the Public Officers Law § 17 protection that the *452 physicians enjoyed in connection with other professional activities that were clearly within the scope of their State employment. Knowing that they were responsible for any liability arising from treatment of these practice plan patients, the physicians purchased malpractice insurance from Frontier, paying lower-than-normal rates because they only practiced part time. Although the Frontier policy expressly excluded coverage for work performed within the scope of the physician’s State employment, it must have been intended to cover treatment of all practice plan patients because otherwise there would be no risk to insure against and, therefore, the policy’s protection would be "illusory”.
The Angtuaco decision (supra) recognizes, however, that there will be some instances in which treatment of practice plan patients is not covered by Public Officers Law § 17: the statute protects such treatment only if the factual criteria outlined therein are present. Thus, treatment for a condition unrelated to the faculty member’s teaching discipline, treatment provided outside the presence of a SUNY student or treatment rendered at a facility that was not authorized or approved by the medical school would give rise to liability for malpractice but would not, under the Angtuaco test, be entitled to the protection of Public Officers Law § 17. In addition, medical services rendered by the physicians that were altogether unrelated to their work for SUNY would fall within the coverage provided by the Frontier policies.
But the largest and most significant area of risk that the Frontier policies protected the physicians from was the risk that, rightly or wrongly, the State would refuse to provide defense and indemnification if they were sued by practice plan patients. Until the decision in Angtuaco (supra) was issued, this was hardly a risk at all, more like a certainty.
The argument that Frontier charges lower-than-normal premiums only because the physician’s private practice is part time overlooks an important factor. If the Frontier policies were intended to cover treatment of all clinical practice patients, even when that treatment was carried out as a teaching exercise for SUNY medical students, it is obvious that the rates would be much higher. Treatment that fulfills a part of the faculty member’s teaching function is not only observed by the students, it is often performed by those students. In Angtuaco (supra), in fact, the parties stipulated that a SUNY resident, under the supervision of the faculty *453 member, performed one half of the tubal ligation procedure that subsequently gave rise to the malpractice action.
The facts stressed by defendant do not support any finding of waiver. They do lead, however, to an overview of the dispute between the State, the faculty physicians and claimant. After the 1978 revision of Public Officers Law § 17, the Department of Law conceded that it was writing "on a clean slate”, that it consistently construed the statute so as to exclude coverage for practice plan patients, and that in 1986, after the Frontier policies began to appear, it "became clear that this difference was going to have to be resolved by the courts”.
Prior to Angtuaco (supra), therefore, the issue of Public Officers Law § 17 was more like an open question than the subject of any long-standing agreement. The State decided to act as if the courts would ultimately decide in its favor; Frontier decided to act as if the courts would ultimately decide in the physicians’ favor; and the physicians decided to act in such a way that they were protected no matter which way the courts ultimately ruled. While such attitudes and expectations have little, if any, effect on the legal rights of the parties or construction of statutes, they do help to explain why the issues herein are being so vigorously litigated.
[Portions of opinion omitted for purposes of publication.]

. The full citation is Kountz v State University of New York, 53 AD2d 856, on remand, 89 Misc 2d 483, revd 61 AD2d 835, on remand 109 Misc 2d 319, affd without opn 87 AD2d 605, lv denied 58 NY2d 747.

. In his memorandum approving the bill, Governor Cuomo stated that the purpose of authorizing a clinical practice plan was "to assure the Institute the capacity to recruit and retain physicians and other licensed health professionals necessary to its clinical programs.” (Governor’s Mem, 1992 McKinney’s Session Laws of NY, at 2882.)