McHugh, J.
I. BACKGROUND
This is the Court’s third pass at a proposed settlement of a tragic and complicated industrial accident resulting in severe and disabling injuries and a lawsuit that has been difficult to resolve because of the insolvency of an excess insurer.
By way of a brief background, Roderick A. Burrows (Mr. Burrows), was an employee of Crane Plumbing & Heating, Inc. Crane was insured for liability and workers’ compensation purposes by Liberty Mutual Insurance Company (Liberty). Crane was a sub-contractor on a building project for which Barkan Construction Company, Inc. (Barkan) was the general contractor. Hartford Accident & Indemnity Co. (Hartford) had issued to Barkan a $500,000 general liability policy that was in effect at the time of the accident. Mission National Insurance Company (Mission) had issued to Barkan an excess general liability policy with at least $300,000 in coverage. That policy, too, was in effect at the time of the accident.
After the accident, Mr. Burrows and other members of the Burrows family sued Barkan to recover for Mr. Burrows’s injuries. Mr. Burrows sued to recover for his own injuries and the Burrows family sued to recover for loss of consortium and parental society. Barkan brought a third-party claim against Crane seeking contractual indemnity. The Burrows family then asserted claims for loss of consortium and parental society directly against Crane.
Mr. Burrows was totally disabled by his injury and his medical expenses were enormous. Liberty, in its capacity as workers’ compensation carrier, paid workers’ compensation benefits, including medical benefits. The amount of those benefits now is in excess of $365,000.
After the suit had been in progress, plaintiff, Barkan and Liberty presented to the Court a petition for approval of settlement pursuant to G.L.c. 152, §15. By that time, however, Mission had become insolvent and the Massachusetts Insurers’ Insolvency Fund (“the Fund”) created by G.L.c. 175D had succeeded to Mission’s interests and obligations. The Court held a hearing on the proposed settlement and, for reasons set forth in a Memorandum and Order dated June 11, 1992, disapproved of the settlement. Subsequently, by separate Order, the Court reconsidered and approved the settlement for reasons set forth in the Order itself. See Memorandum and Order dated March 8, 1993.
Now the plaintiff has moved for modification of the settlement agreement. The modification would entail three principal changes from the settlement the Court approved. First, the modification would require the Fund to pay $300,000 in cash instead of requiring Mr. Burrows to use the Fund’s payment obligation as a $300,000 credit in his favor on Liberty’s workers’ compensation lien.
*453 Second, the revised agreement contemplates — indeed, is dependent on — the Industrial Accident Board’s approval of an agreement between Mr. Burrows and Liberty, in Liberty’s capacity as Crane’s workers’ compensation insurer, under which Liberty would give its right to recover payment on its workers’ compensation lien in return for Mr. Burrows’s agreement to a $1.00 lump-sum settlement of Liberty’s future obligations to Mr. Burrows with the exception of Liberty’s obligation to make medical payments. Liberty’s obligation to make medical payments would continue for the duration of Mr. Burrows’s life.
Third, Crane, which had not participated in the earlier settlement agreement, now has agreed with Mr. Burrows and the Burrows family to a settlement under which Mr. Burrows and the family would receive a total of $365,000 in full settlement of Crane’s obligations, said sum to be allocated between Mr. Burrows and his family as they themselves agree.[1] Mr. Burrows and the Burrows family have allocated the entire amount to Mr. Burrows.
All parties save the Fund agree to the modified settlement proposal. The Fund argues that the modified proposal should not be approved because (1) a prior and different agreement already has been approved, (2) compelling the Fund to pay $300,000 to Mr. Burrows would amount to compelling an impermissible payment to another insurance company and (3) compelling the Fund to pay $300,000 overlooks and ignores the Fund’s right to subrogation.
II. PRIOR ORDER
The Fund, of course, is correct that a prior order of this Court approved a settlement in this case different from the one now proposed. That prior order, however, contemplated a settlement only between Mr. Burrows and the Burrows family, on the one hand, and the Barkan interests, on the other, and expressly left open the controversy between the Burrowses and Crane. The present proposal would resolve the latter controversy as well and thus does not simply impose a new solution on the facts previously before the Court.
More important, no final judgment has entered in this case and no such judgment has been ordered as to any phase of this case pursuant to Mass.Sup.Ct. 54(b). Unless final judgment disposing of the entire case enters or final judgment is ordered as to a part of the case pursuant to Rule 54(b), any order the court enters is interlocutory in character and “is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.” Mass.R.Sup.P. 54(b). The existence of a prior, interlocutory order thus is no bar to entry of a final order disposing of the entire case.
III. PAYMENT FOR BENEFIT OF ANOTHER INSURER
The Fund also is correct in its assertion that it cannot be compelled to pay monies that would benefit another insurer. Ferrari u. Toto, 383 Mass. 36, 38-39 (1981). The Fund only is obligated to pay “covered claims” and those do not include “any amount due any . . . insurer,” including a workers’ compensation insurer. G.L.c. 175D, §§1(2), 5(l)(a).
The settlement now proposed runs afoul of principles expressed in the cited statutes, says the Fund, for two reasons. First, Mr. Burrows’s proposed settlement with Liberty makes no economic sense unless the Fund’s $300,000 is included in the consideration Liberty is to receive. Thus, the Fund contends, the Fund’s payment of $300,000 must be deemed to be a part of the Liberty settlement and amounts to a prohibited payment in favor of an insurance company. Second and more broadly, the Fund maintains that Mr. Burrows cannot enter into an arrangement to compromise the Liberty lien, even if that compromise makes economic sense, if the effect of the compromise adversely affects the Fund. Broadly — but accurately — stated, the Fund’s position is that any Fund payment that forms part of a network of economic benefits is impermissible if some aspect of that network is to the advantage of a solvent insurer.
That is not what the statutory language says and no case thus far decided by an appellate court suggests that that is what the statutory language means. A wide gulf separates the Fund’s position as thus stated and judicial decisions stating that an insurer cannot waive a fully-matured and unconditional claim if the effect of that waiver would be to surrender an “amount due” and thereby impose on the Fund a payment obligation it would not otherwise have had. Ferrari v. Toto, 383 Mass. 36, 38 n.2 (1981); Kinney v. Leaman, 14 Mass.App.Ct. 926 (1982).
Moreover, even considered in isolation, the arrangement between Mr. Burrows and Liberty does make economic sense. Liberty, having paid out more than $365,000, faces a substantial continuing series of payments to Mr. Burrows, now 44 years of age and who was earning $635.00 per week at the time of the injury, for a substantial future period. See generally G.L.c. 152, §§34A, 36(l)(j), 361(k). While Mr. Burrows’s life expectancy has been shortened by his accident, the amount of Liberty’s future liability for wage payments,[2] taking into account any applicable offsets calculated in accordance with Hunter v. Midwest Coast Transp., Inc., 400 Mass. 779 (1987), but excluding cost-of-living increases, potentially is in excess of $400,000.00.[3]
Against that exposure, the Hunter fund upon which Liberty would be able to draw for reimbursement would consist of the approximately $15,000.00 net “excess” recovery Mr. Burrows received from the first phase of the settlement[4] and his net share of the recovery on the assigned claim. The maximum recovery on the assigned claim would be $400,000.00, plus interest.[5] Likely attorneys fees and costs would reduce the net to the vicinity of $250,000.00. Even assuming that the entire net were allocated to Mr. Burrows, a total Hunter fund of approximately $265,000.00 would *454 be available to satisfy a potential liability of approximately $400,000. It is not irrational, on those facts alone, for Liberty to conclude that the proposed settlement was appropriate even if no other aspects of the settlement exchanges were taken into account.
Of course, there are other ways to analyze the risks and gains the proposed settlement is likely to produce. There always are. As suggested in the last opinion, the broad and sweeping interpretation for which the Fund contends would have a paralytic effect on the process of settling all but garden-variety claims, a paralytic effect likely to weigh heaviest on claims where the most is likely to be at stake and where risk reduction through settlement thus should be most strongly encouraged. Accordingly, the Fund’s interpretation is not supported by the statutory language or by the practical consequences the Fund’s interpretation would likely have.
SUBROGATION
In the last analysis, the shoal on which plaintiffs’ current settlement proposal founders involves the doctrine of subrogation. The difficulty arises partly because Barkan assigned to plaintiffs in settlement of their claim against Barkan a right that Barkan did not fully own and partly because of the statutory provisions that created the Fund.
As the participants, and readers of these several opinions, will recall, Barkan’s settlement with plaintiffs consisted of two parts. First was a “payment” that exhausted all of Barkan’s available insurance. That “payment” was worth $800,000.[6] The second portion of the settlement was Barkan’s assignment to. the Burrows family of Barkan’s contractual claims against Crane, Mr. Burrows’s employer. The assigned claims rested on of a variety of alleged breaches of Crane’s contractual undertakings to Barkan, including Crane’s undertaking to indemnify Barkan under certain circumstances[7] and its agreement to procure insurance naming Barkan as an assured.
Barkan’s assignment meant that Mr. Burrows, as assignee, had a contractual claim against Crane, his employer, and that the remaining members of the Burrows family had both a contractual claim against Crane, as assignees, and a common-law claim against Crane for loss of consortium and services. The theoretical cap on the contractual claim was $800,000.00, the amount Barkan had “paid” to settle the claims the Burrows family had asserted against it directly. There was, of course, no externally-imposed cap on the tort claim.
The present difficulty arises because of the Fund’s assertion of its intent to exercise against Crane what the Fund claims is a right of subrogation in the event that the Fund is actually compelled to pay money to any member of the Burrows family.[8] Crane is unwilling to enter into the settlement presently proposed unless it can be assured by all concerned interests that the settlement extinguishes its liability to everyone for all claims. In an effort to give Crane that assurance, plaintiffs, Crane and Liberty, both in its capacity as Crane’s insurer and in its capacity as Barkan’s workers’ compensation insurer, seek what amounts to a declaration that the Fund in fact has no right of subrogation. I, however, am of the opinion that it does.[9]
Subrogation is a doctrine both equitable and contractual in nature. In equity, subrogation is
an equitable arrangement incident to all contracts of indemnity and to all payments on account thereof. “The general rule of law (and it is obvious justice),” said Lord Blackburn, “is that [where] there is a contract of indemnity (it matters not whether it is a marine policy or a policy against fire on land, or any other contract of indemnity) and a loss happens, anything which reduces or diminishes that loss reduces or diminishes the amount which the indemnifier is bound to pay; and if the indemnifier has already paid it, then if anything which diminishes the loss comes into the hands of the person to whom he has paid it, it becomes an equity that the person who has already paid the full indemnity is entitled to be recouped by having that amount back.”
”... As between the underwriter and the assured, the underwriter is entitled to the advantage of every right of the assured, whether such right consists in contract, fulfilled or unfulfilled, or in remedy for tort capable of being insisted on or already insisted on, or in any other right... by the exercise or acquiring of which right or condition the loss against which the assured is insured, can be, or has been diminished.”
The Travelers Insurance Company v. Graye, 358 Mass. 238, 240-41 (1970). Even if no equitable right of subrogation exists, parties to a contract can create the right by their own agreement. Frost v. Porter Leasing Corp., 386 Mass. 425, 427 (1982).
Moreover, the non-contractual right to subrogation is not limited to instances in which an insurer pays its own assured for damage to the assured’s property. The right also arises when a liability insurer discharges liability the assured has incurred. Bugh v. Viera, 328 Mass. 201, 202 (1952). See State of New York v. U.W. Marx, Inc., 618 N.Y.2d 135, 138 (App. Div. 1994); Frontier Insurance Co. v. State of New York, 146 Mise. 2d 237, 550 N.Y.S.2d 243, 246 (N.Y. Claims 1989).[10]
It is true, as plaintiffs assert, that the doctrine of subrogation does not require reimbursement of an insurer when the insurer has paid its assured for a personal injury claim as opposed to a property damage claim. The difficulty of ascertaining the real value of full and fair compensation for personal injuries makes equally difficult all efforts to determine when there has been a true double recovery and thus when a right to subrogation should exist. See generally Frost v. Porter Leasing Co., 386 Mass. 425, 429 (1982). That ratio *455 nale, however, has no applicability to this case for the Fund seeks to assert its rights as Barkan’s subrogee, not the Burrowses’. The extent of the Fund’s subrogation right is easily ascertainable: it equals the $300,000.00 the Fund will have paid to discharge Barkan’s liability.
Liberty, joined by plaintiffs, also asserts that the Fund has no right of subrogation because subrogation is designed to prevent the assured from receiving a windfall though double recovery.[11] Liberty says that no double recovery is possible here because Barkan has assigned to plaintiffs Barkan’s right to pursue Crane and thus has removed forever any possibility of Barkan’s recovering twice. That argument is something of a self-wielding sword. Plaintiffs, as Barkan’s assignees, have no greater rights to hold and keep the fruits of a recovery from Crane than does Barkan itself. See generally Ford Motor Credit Co. v. Morgan, 404 Mass. 537, 545 (1989). The question is whether Barkan, not the plaintiffs, has a right to the Crane proceeds that trumps the Fund’s. Plaintiffs succeed only if the answer to that question is “yes.” The answer, however, is “no.”
The non-Fund parties also argue that no right to subrogation exists in the absence of a contract creating that right. That argument ignores the doctrine of equitable subrogation. Equally important, the contract between Mission, in whose shoes the Fund stands, and Barkan does expressly create a right of subrogation. Condition M of the Mission policy states as follows:
Inasmuch as this policy is “Excess Coverage,” the Insured’s right of recovery against any person or other entity cannot be exclusively subrogated to the Company. It is, therefore, understood and agreed that in case of any payment hereunder, the Company will act in concert with all other interests (including the Insured) concerned, in the exercise of such rights of recovery. The apportioning of any amounts which may be so recovered shall follow the principle that any interests (including the Insured) that have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Company is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests, (including the Insured) of whom this coverage is ifi excess are entitled to claim the residue, if any . . .
To be sure, the first sentence of Condition M creates no subrogation right. But, by creating a mechanism for distribution of the assured’s potential recoveries, the second and third sentences surely do.
Finally, plaintiffs, in response to the Fund’s assertion of its subrogation right and the briefs all parties have filed, proposed to the Court another modification of the settlement that would redirect the entire Crane settlement proceeds from Mr. Burrows to Mrs. Burrows and the Burrows children. There are several ways to look at that proposal and the Court’s involvement in it. One would be to view the settlement as allocation of recovery under the assigned claim entirely to Mrs. Burrows and the children. Another would be to view the settlement as a waiver by Mr. Burrows and the Burrows family of the assigned claim and an assertion solely of the common-law claims. A third would be to view it as a combination of both.
The difficulty for present purposes is that no view of those proposals vaporizes the subrogation problem. The right to subrogation arises upon the Fund’s payment of money to discharge Barkan’s obligation. The right does not depend on the destination of the payment or upon the theory on which the payees ultimately recover from others. Thus, although the Burrowses’ abandonment of the assigned claim would insulate their recovery from Crane from attack by the Fund, abandonment of the assigned claim would not prevent the Fund from asserting Barkan’s rights under the Barkan Crane contract directly against Crane.
The present issue illustrates once again the difficulties in settlement of complex cases produced by the scheme embodied in c. 175D. Settlements are possible only when parties have a common interest in the settlement process and the results the settlement is designed to achieve. That common interest exists only when the parties believe that not settling has a reasonable possibility of producing less favorable results. In cases of serious injury where the Fund’s $300,000 exposure is likely to be capped out, the Fund operates in an environment where it has little incentive to settle or to compromise any right it arguably possesses. Because the Fund’s liability is capped at $300,000, the settlement pressures typically imposed on an insurer by the specter of recovery in excess of the coverage are not present. The Fund, at least by implication, see generally Poznik v. Massachusetts Medical Professional Insurance Ass’n, 417 Mass. 48 (1994), is not subject to G.L.c. 93A and thus has none of the incentives to avoid taking every argument to its logical extension that otherwise impose a break on insurers subject to that chapter’s rigors. The Fund is prohibited from paying money to another insurer and thus pressures for case resolution generated by potential liability to other insurers are not present. In sum, the Fund operates in a statutoiy orbit of its own, a circumstance likely to cause its interests to collide with some frequency with those of all other parties to complex cases.
Be all of that as it may, the parties other than the Fund are not entitled to a declaration that the Fund has no right of subrogation. Because such a declaration was a condition precedent to Crane’s agreement to the settlement, I cannot approve the settlement in its present form.
ORDER
In light of the foregoing, the Court will hold a status conference in this action on March 28, 1995 at 2:45 p.m.

The Burrows family participates in a settlement with Crane to resolve the family’s tort claim. Mr. Burrows participates as the beneficiary of Barkan’s contractual indemnity claim against Crane because Barkan assigned that claim to Mr. Burrows as part of its settlement with him.

Liberty’s liability for medical payments survives the settlement and thus has not been taken into account for purposes of these calculations.

To be sure, that is the future, not the present, value of the exposure. No one has presented any analysis of the present value or the question whether, taking into account inflation and an appropriate discount rate, there is any difference between the present and future values. Those are themselves issues and questions the parties undoubtedly considered when attempting to determine an appropriate settlement.

See Memorandum & Order of June 8, 1992 at 2.

Although the matter has not been discussed by the parties, it is likely that interest on the indemnity claim would run, not from commencement of the action, but instead from the time that Barkan made the payment for which it seeks indemnity. See generally, e.g., Steralite Corp. v. Continental Cos. Co., 397 Mass. 837, 841-42 (1986).

$500,000 of that was paid in cash by Barkan’s primary insurer and exhausted the primary insurance layer. Under the original settlement the Court approved, the remaining $300,000 was to be paid in cash by the Fund. Under the settlement proposal ultimately approved, that $300,000 was to be a credit against the amount of Liberty Mutual’s workers’ compensation lien on Mr. Burroughs’s recovery. The Fund maintained at one point — indeed still maintains, see Fund Brief of April 8, 1994 at 5-6 — that the Court has no power to order the Fund to make any cash payment. I resolved that argument against the Fund in the Memorandum and Order dated August 12, 1992.

The indemnity agreement’s validity might be suspect, see G.L.c. 149, §29C, Harnois v. Quannapowitt Development, Inc., 35 Mass.App.Ct. 286 (1993), but for the fact that the agreement was executed before 1984. See generally Jones v. Vappi & Co., Inc., 28 Mass.App.Ct. 77, 81-82 (1989).

If the Fund discharges its obligation to Barkan by obtaining for Mr. Burrows a credit against the outstanding amount of the workers’ compensation lien, then everybody agrees that the Fund would have made no “payment” and would have no right to subrogation.-

Although the matter was not fully briefed and argued, I also disagreed- in the opinion that approved the settlement currently in effect. As a result, the Fund suggests that my earlier statement is, at least, the law of the case and resolves all subrogation issues on which the parties currently have focused. Even if the earlier ruling is the “law of the case,” no final judgment has entered and thus, in appropriate circumstances, any earlier judgment, pronouncement or expression of opinion is subject to revision if the interests of justice dictate that revision is in order. King v. Globe Newspaper Co., 400 Mass. 705, 707-08 (1987); Mass.R.Civ.P. 54(b). In sum, the earlier discussion of the issue does not foreclose its discussion now.

The right of subrogation arises only on payment. Accordingly, the parties who assert that the Fund has no present right of subrogation are correct because, at the moment, the fund has paid nothing to anyone. The present request for settlement approval, however, must focus on the consequences of the settlement. The moment the Fund makes a payment, any potential right of subrogation the Fund possesses will ripen and will yield the consequences against which Crane seeks to guard. Therefore, consideration of the Fund’s subrogation right is appropriate — indeed, necessary— now.

 If the insurer pays a loss and the assured then is permitted to keep the proceeds of recovery from an indemnifying third party, the assured winds up with twice the assets it had before its liability arose. In other words, to allow the assured to keep the proceeds of a third-party recovery would permit the assured to receive indemnity twice for the same loss.